**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

CHULA VISTA CITIZENS FOR JOBS
AND FAIR COMPETITION; LORI
KNEEBONE; LARRY BREITFELDER;
ASSOCIATED BUILDERS AND
CONTRACTORS OF SAN DIEGO, INC.,
                *Plaintiffs-Appellants*,

                v.

DONNA NORRIS; MAYOR CHERYL
COX; PAMELA BENSOUSSAN; STEVE
CASTANEDA; JOHN MCCANN, in his
official capacity as Member of the
Chula Vista City Council; RUDY
RAMIREZ, JR., in his official
Capacity as Member of the Chula
Vista City Council,
                *Defendants-Appellees*,

STATE OF CALIFORNIA,
        *Intervenor-Defendant–Appellee*.

No. 12-55726

D.C. No.
3:09-cv-00897-
BEN-JMA

OPINION

Appeal from the United States District Court
for the Southern District of California
Roger T. Benitez, District Judge, Presiding

Argued and Submitted
November 6, 2013—Pasadena, California

Filed June 16, 2014

Before: Diarmuid F. O'Scannlain, Susan P. Graber, and Carlos T. Bea, Circuit Judges.

Opinion by Judge O'Scannlain, in which Judge Graber joins, except as to Part IV, and in which Judge Bea joins, except as to Part III. Judge Graber filed an opinion dissenting as to Part IV. Judge Bea filed an opinion concurring as to Part III.

## SUMMARY[*]

### Civil Rights

The panel affirmed in part and reversed in part the district court's summary judgment and remanded in an action brought by two associations and two individuals alleging that certain provisions of the California Elections Code pertaining to initiatives and referenda, as incorporated into the Chula Vista, California Charter, violated the First Amendment.

Plaintiffs challenged the state and local requirements that: (1) official proponents of local ballot initiatives be electors, which excludes non-natural persons and thereby excludes associations; and (2) official initiative proponents identify themselves on the face of the initiative petitions.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel first determined that as to the challenge to the elector requirement, abstention under *Railroad Commission v. Pullman Co.*, 312 U.S. 496 (1941), was not warranted because the challenge implicated the chilling of expression and the parties had not indicated that there were any pending actions in the California courts.

Affirming the district court's summary judgment to the defendants on the elector requirement, the panel held that associations do not have a First Amendment right to serve as official proponents of local ballot initiatives.

Reversing the district court's summary judgment to the defendants as to the petition-proponent disclosure requirement, the panel held that the requirement did not satisfy exacting scrutiny and therefore §§ 9202 and 9207 of the California Elections Code were invalid to the extent that the provisions require official initiative proponents to identify themselves on the face of initiative petitions.

Concurring in part and dissenting in part, Judge Graber agreed with the majority opinion that the case was properly before the court, and concurred in Part III of the opinion, which held that the elector requirement passed constitutional muster. She wrote separately to dissent from Part IV of the opinion and stated that the petition-proponent disclosure requirement survived any level of review.

Concurring, Judge Bea joined all of the majority opinion except for Section III, which analyzed the local and state requirements that official ballot initiative proponents be electors, thereby excluding associations. Judge Bea wrote that although he concurred in the result of Section III, he believed that the majority opinion employed an incorrect test

to determine whether the elector requirement burdened any First Amendment rights.

---

**COUNSEL**

James Bopp, Jr., The Bopp Law Firm, PC, Terre Haute, IN, argued the cause for the Plaintiff-Appellant. Richard E. Coleson, The Bopp Law Firm, PC, Terre Haute, IN, filed the briefs for the plaintiff-appellant. With him on the briefs were James Bopp, Jr., The Bopp Law Firm, PC, Terre Haute, IN; Charles H. Bell, Jr., and Brian T. Hildreth, Bell, McAndrews & Hiltachk, LLP, Sacramento, CA; and Gary D. Leasure, Workman Leasure, LLP, San Diego, CA.

Charles A. Bird, McKenna Long & Aldridge, LLP, San Diego, CA, argued the cause and filed a brief for the Defendant-Appellee.

George Waters, Deputy Attorney General of California, Sacramento, CA, argued the cause and filed a brief for the Defendant-Intervenor–Appellee. With him on the brief were Kamala D. Harris, Attorney General of California; Douglas J. Woods, Senior Assistant Attorney General; and Peter A. Krause, Supervising Deputy Assistant Attorney General, Sacramento, CA.

---

**OPINION**

O'SCANNLAIN, Circuit Judge:

We must decide whether associations have a First Amendment right to serve as official proponents of local ballot initiatives and the extent to which the same Amendment protects the anonymity of initiative proponents.

I

A

This case arises from a political battle concerning labor unions. Chula Vista Citizens for Jobs and Fair Competition ("Chula Vista Citizens"), an unincorporated association, and Associated Builders and Contractors of San Diego, Inc., an incorporated association of construction-related businesses ("the Associations"), sought to place an initiative on the Chula Vista municipal ballot. As described by the title of the initiative, the proposed measure "mandat[ed] that the City or Redevelopment Agency not fund or contract for public works projects where there [was] a requirement to use only union employees." The City of Chula Vista requires that initiative proponents be electors ("the elector requirement"), which excludes non-natural persons from serving as official proponents. Faced with this obstacle, Chula Vista Citizens asked two of its members, Lori Kneebone and Larry Breitfelder, to serve as proponents in place of the Associations. They agreed.

Section 903 of the Chula Vista Charter incorporates the provisions of the California Elections Code that govern initiatives and referenda "so far as such provisions of the

Election Code are not in conflict with [the] Charter." The code establishes several requirements that official proponents must meet to qualify an initiative. First, proponents must file a notice of intent to circulate an initiative petition for signatures, and such notice must be signed by at least one but not more than three proponents. Cal. Elec. Code § 9202(a) (the "notice-filing requirement"). Defendant Donna Norris, as the City Clerk, receives and processes these filings. Proponents must include the written text of the initiative and may include a 500-word statement of "reasons for the proposed petition." *Id.* The City Attorney then provides a title and summary of the measure to the proponents. *Id.* § 9203.

Because the City has a newspaper of general circulation, the proponents must publish the notice of intent, title, and summary in such newspaper and submit proof of publication to the City Clerk. *Id.* § 9205(a) (the "publication requirement").[1] Only at that point can the proponents begin circulating their petition for signatures. *Id.* § 9207.

The initiative petition is typically divided into "sections" to facilitate gathering signatures. *See id.* § 9201. Each section of the petition must "bear a copy of the notice of intention and the title and summary prepared by the city attorney." *Id.* § 9207. Because § 9202(a) requires proponents to sign the notice, the effect of § 9207 is that the identities of official proponents are disclosed to would-be signatories of the petition (the "petition-proponent disclosure requirement"). Proponents have 180 days to file the signed

---

[1] Where no such newspaper exists for either the city or the county, the same information must be posted at three designated public places in the city. Cal. Elec. Code § 9205(b).

petitions with the City Clerk bearing the requisite number of signatures. *Id.* § 9208. The City Clerk informs the proponents whether they have gathered enough valid signatures to qualify the initiative for the ballot. Whether the initiative appears on the ballot or immediately becomes law depends on the number of signatures gathered and the actions taken by the City Council.

Kneebone and Breitfelder made two attempts to qualify the initiative for the ballot. The first attempt ("First Petition") began on August 28, 2008, with the filing of the notice of intent. Kneebone and Breitfelder later submitted 23,285 signatures to Norris after having complied with all the requirements except one: They had not included their names on the notice that appeared on the circulated petitions. Instead, as Kneebone and Breitfelder later informed Norris, they printed the following statement at the end of each circulated petition: "Paid for by Chula Vista Citizens for Jobs and Fair Competition, major funding by Associated Builders & Contractors PAC and Associated General Contractors PAC to promote fair competition." On November 12, 2008, Norris rejected the First Petition for failure to include the proponents' signatures on the notice accompanying the circulated petitions.

The Associations again asked Kneebone and Breitfelder to serve as proponents, which the pair again agreed to do. The second attempt ("Second Petition") began with the notice filing on March 13, 2009. It complied with all requirements—including the requirement that circulated petitions bear the proponents' signatures—appeared on the June 8, 2010 municipal election ballot, and was approved by voters.

B

On April 28, 2009, after Norris rejected their First Petition but before qualifying the Second Petition, the plaintiffs brought this 42 U.S.C. § 1983 suit in the Southern District of California seeking declaratory and injunctive relief.  The complaint alleged that the elector and petition-proponent disclosure requirements, both facially and as applied, violate the First Amendment.  On June 4, the plaintiffs moved for a preliminary injunction and for an expedited hearing.  Because provisions of the state election code were at issue, the State of California intervened as a defendant.

The district court held a hearing on the preliminary injunction motion on August 19.  The next day, it ordered supplemental briefing as to whether the Elections Code did, in fact, require that official proponents be natural persons.  On March 8, 2010, the district court denied the preliminary injunction motion as moot in light of the success of the Second Petition, and it stayed consideration of the § 1983 suit pending the Supreme Court's decision in *Doe v. Reed*, 561 U.S. 186 (2010).  When the district court lifted the stay, both sides filed motions for summary judgment.  The district court granted summary judgment to Norris and her co-defendants on March 22, 2010.  It entered its judgment on April 10, and plaintiffs timely appealed.

II

We must first determine whether the dispute over the elector requirement is properly before us.  The parties disagree about whether the elector requirement is mandated by state law, municipal law, or the City's interpretation of

either body of law.  Relying on the Supreme Court's decision in *Railroad Commission v. Pullman Co.*, 312 U.S. 496 (1941), Norris urges us to abstain from deciding the merits of this case if doing so would require us to resolve a contested issue of state law.

"[W]hen a federal constitutional claim is premised on an unsettled question of state law, the federal court should stay its hand in order to provide the state courts an opportunity to settle the underlying state-law question and thus avoid the possibility of unnecessarily deciding a constitutional question." *Harris Cnty. Comm'rs Court v. Moore*, 420 U.S. 77, 83 (1975).  *Pullman* abstention counsels against deciding unnecessary federal constitutional questions, but it is also premised on "avoid[ing] federal-court error in deciding state-law questions antecedent to federal constitutional issues." *See Arizonans for Official English v. Arizona*, 520 U.S. 43, 76 (1997).  Because abstention "does not implicate [federal courts'] subject matter jurisdiction," we are "never *required* to apply *Pullman*." *Columbia Basin Apartment Ass'n v. City of Pasco*, 268 F.3d 791, 802 (9th Cir. 2001).  "Abstention is, of course, the exception and not the rule, and [the Supreme Court has] been particularly reluctant to abstain in cases involving facial challenges based on the First Amendment." *City of Houston v. Hill*, 482 U.S. 451, 467 (1987) (internal citation omitted).

We consider three factors when deciding whether *Pullman* abstention is appropriate: "(1) there are sensitive issues of social policy upon which the federal courts ought not to enter unless no alternative to its adjudication is open, (2) constitutional adjudication could be avoided by a state ruling, and (3) resolution of the state law issue is uncertain."

*Wolfson v. Brammer*, 616 F.3d 1045, 1066 (9th Cir. 2010) (internal quotation marks omitted).

The Supreme Court has held that abstention in the First Amendment context is disfavored because "the delay of state-court proceedings might itself effect the impermissible chilling of the very constitutional right [the plaintiff] seeks to protect." *Hill*, 482 U.S. at 467–68 (internal quotation marks omitted). Our court has been particularly loath to abstain in First Amendment cases: "We have held that, in First Amendment cases, the first *Pullman* factor will almost never be present because the guarantee of free expression is always an area of particular federal concern." *Porter v. Jones*, 319 F.3d 483, 492 (9th Cir. 2003) (internal quotation marks omitted). This concern "applies to both facial and as-applied challenges." *Id.* at 493. In fact, we have abstained only once in a First Amendment context, and that case had an "unusual procedural setting" because the "issue in question was already before the state supreme court." *Id.* at 493–94. In every other procedural setting, we have rejected abstention.

The challenge to the elector requirement implicates the chilling of expression. *Hill*, 482 U.S. at 467–68. Indeed, if the elector requirement is unconstitutional, the Associations are being *completely* deprived of a constitutional right. Moreover, the parties have not indicated that there are any pending actions in the California courts. *Porter*, 319 F.3d at 492. In this context, the first *Pullman* factor is not met, and abstention is not warranted. *Id.* The merits are thus before us.[2]

---

[2] Despite the successful qualification and passage of the initiative advocated by the plaintiffs, this case is not moot because it is "capable of repetition, yet evading review." *Fed. Election Comm'n v. Wis. Right to*

## III

The First Amendment provides, "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I. By virtue of the Fourteenth Amendment, the First Amendment applies to actions by state governments. *Everson v. Bd. of Educ.*, 330 U.S. 1, 8 (1947). The Associations contend that the elector requirement abridges the rights of speech, association, and petition. They further argue that strict scrutiny applies to the elector requirement and results in its invalidity. We begin with the threshold issue of whether the elector requirement implicates the First Amendment.

## A

Although the Associations allege violations of speech, associational, and petition rights, our analysis will focus on the freedom of speech. The Associations mention their petition claim, but they provide no legal authority to support it. "A passing reference to an issue in a brief is not enough, and the failure to make arguments and cite authorities in support of an issue waives it." *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012); *Acosta-Huerta v. Estelle*, 7 F.3d 139, 144 (9th Cir. 1993). Thus, we do not address the Associations' petition claim.

The Associations also allege that the elector requirement is an unconstitutional condition on their right to associate for

*Life, Inc.*, 551 U.S. 449, 462 (2007); *see also Davis v. Fed. Election Comm'n*, 554 U.S. 724, 735 (2008).

purposes of political expression.  *See Speiser v. Randall*, 357 U.S. 513, 520–29 (1958).   In the First Amendment context, the right to associate is not a free-standing right; rather, one has the right to associate for the purpose of engaging in activities protected by the First Amendment. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647–48 (2000); *Roberts v. U.S.   Jaycees*, 468 U.S. 609, 617–18 (1984).   The Associations claim that serving as an official proponent is protected by the Free Speech Clause, and thus that they have a right to associate for the purpose of serving as official proponents.  Thus, if serving as an official proponent is not an aspect of free speech, the condition imposed by the elector requirement does not violate the associational rights of the First Amendment.  *See Dale*, 530 U.S. at 648 ("To determine whether a group is protected by the First Amendment's expressive associational right, we must determine whether the group engages in 'expressive association.'"); *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989) (holding that, where the First Amendment does not protect a certain activity, there can be no First Amendment right of association to engage in that activity).  Because the Associations' claim regarding freedom of association depends on the success of their Free Speech claim, we focus on the latter claim.

The question, then, is whether the elector requirement is a law "abridging the freedom of speech."   U.S. Const. amend. I.

B

To know whether the elector requirement abridges the freedom of speech, it is important to identify precisely what sort of infringement the requirement allegedly commits.  The

Associations list several activities performed by official proponents that they contend are protected speech:

> [B]eing a proponent involves core political activity beyond ministerial acts of signing and filing things. A "proponent" begins with an idea about an issue, creates the text of an initiative to implement that idea, does the necessary publication of notices to qualify it, circulates petitions and/or arranges with others to do so, and advocates for the initiative.

The Associations' listing of these ostensibly expressive activities implies that associations are prohibited from engaging in them. But the Associations' actions in this case belies that implication. As stated in their complaint, the Associations "decided to propose the Initiative." "Chula Vista Citizens filed *its* required Clerk's Version" of the initiative text, just as "Chula Vista Citizens published the Newspaper Version," for which "[n]either Ms. Kneebone nor Mr. Breitfelder paid any money." "Chula Vista Citizens hired The La Jolla Group to circulate the Petition in the City," and, as the district court pointed out, the Associations were free to advocate for the initiative's qualification and enactment. In short, the Associations were able to participate in all of the activities they mention.

However, the Associations were dependent on Kneebone and Breitfelder as official proponents in order to engage in these activities. That is the gravamen of their alleged injury. The Associations believe the elector requirement violates the Free Speech Clause because, in their words, "speech-by-proxy is not a constitutionally permissible alternative because

it does not allow associations *themselves* to speak." The Associations would rather have the legal authority to engage in these activities without relying on natural persons to serve as proxies, and that requires them to be official proponents.

What the Associations seek, then, is the legal authority attaching to the status of an official proponent,[3] and this amounts to a claim that serving as an official proponent is a form of "speech" protected by the First Amendment.

C

We must next determine the nature of the legal authority of official proponents. The Associations do not dispute that the initiative power is a legislative power. And rightly so. As the California Supreme Court has said, the initiative process "represents an exercise by the people of their reserved power to legislate." *Builders Ass'n of Santa Clara-Santa Cruz Cntys. v. Superior Court*, 529 P.2d 582, 586 (Cal. 1974).[4]

---

[3] The mere fact that the Associations have to rely on proxies to participate in these activities is insufficient, by itself, to violate the Free Speech Clause. If serving as an official proponent is not part of the freedom of speech, then it does not matter, for First Amendment purposes, that the Associations must rely on proxies who *can* serve as official proponents. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 337–40 (2010).

[4] In determining whether the authority of official proponents is legislative in nature, our inquiry is two-fold: (1) what powers, duties, and responsibilities are delegated to official proponents, and (2) whether those powers, duties, and responsibilities are legislative in character for First Amendment purposes? California law, and the state courts' interpretation of California law, is dispositive as to the first question, but the second question—which determines whether the First Amendment is implicated by the elector requirement—is up to federal courts to decide.

Norris argues that the distinct role of proponents is to introduce legislation: "[T]he legal acts of a Proponent are acts of legislating, exercising the inherent, reserved power of citizens to legislate for the entity in which they reside." Under this theory, because the initiative process is a lawmaking one, the activities that commence that process are analogous to the introduction of legislation. At least two California appellate courts support this description of the initiative process. *San Francisco Forty-Niners v. Nishioka* said the following:

> The initiative petition with its notice of intention is not a handbill or campaign flyer— it is an official election document subject to various restrictions by the Elections Code, including reasonable content requirements of truth. It is the constitutionally and

---

Our two-step analysis is no different than what we do in myriad areas of constitutional law. *See, e.g.*, *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 9 (1978) ("The Fourteenth Amendment places procedural constraints on the actions of government that work a deprivation of interests enjoying the stature of 'property' within the meaning of the Due Process Clause. Although the underlying substantive interest is created by an independent source such as state law, federal constitutional law determines whether that interest rises to the level of a legitimate claim of entitlement protected by the Due Process Clause." (internal quotation marks omitted)); *see also Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756–57 (2005) (same). This method of analysis is all the more important when federal courts seek to analyze the structure of state government, implicating bedrock principles of federalism and state sovereignty. *See Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 71 (1978) ("Government . . . is the science of experiment, and a State is afforded wide leeway when experimenting with the appropriate allocation of state legislative power." (internal quotation marks and citation omitted)).

> legislatively sanctioned method by which an
> election is obtained on a given initiative
> proposal.

89 Cal. Rptr. 2d 388, 396 (Ct. App. 1999). *Widders v.
Furchtenicht* stated that the legislative process begins once a
petition is circulated for signatures: "An initiative is put
before the people when they are asked to sign a petition to
place it on the ballot . . . ." 84 Cal. Rptr. 3d 428, 438 (Ct.
App. 2008) (internal quotation marks and citation omitted).
If the activities involved in qualifying an initiative for the
ballot start the legislative process, then official proponents
exercise part of the legislative power.

The Associations resist this characterization. They
distinguish between *placing* an initiative on the ballot (which
they concede is a legislative function) and *asking electors* to
place an initiative on the ballot (which they contend is a non-
legislative act). At oral argument, the Associations
analogized initiative proponents to lobbyists: The official
proponents come to the legislators (i.e., the electors) with a
proposal and ask the legislators to introduce a bill (i.e., sign
the petition to place the initiative on the ballot).

The problem with the Associations' proffered distinction
is that the incidental role the Associations assign to official
proponents is inconsistent with the responsibilities conferred
on official proponents by the California Elections Code. As
the California Supreme Court has said, "[O]fficial proponents
of an initiative measure are recognized as having a distinct
role—involving both authority and responsibilities that differ
from other supporters of the measure." *Perry v. Brown*,
265 P.3d 1002, 1017–18 (Cal. 2011). Official proponents
determine when the process will begin by filing the relevant

documents, Cal. Elec. Code § 9202(a), craft the text of the initiative that will be put before the people, *id.*, ensure that the people know that the initiative process has commenced, *id.* § 9205(a)–(b), and exercise a measure of control over the arguments in favor of the initiative to which the people will be exposed, *id.* § 9287.  Thus, the California Elections Code "place[s] an obligation upon the official proponents of an initiative measure to manage and supervise the process by which signatures for the initiative petition are obtained." *Perry*, 265 P.3d at 1017.  If public officials refuse to defend a successful initiative in court, official proponents may "intervene or [] participate as real parties in interest in a judicial proceeding to assert the state's interest in the initiative's validity and to appeal a judgment invalidating the measure." *Id.* at 1025.  *But see Hollingsworth v. Perry*, 133 S. Ct. 2652, 2663–67 (2013) (holding that official proponents of California's Proposition 8 lacked Article III standing in federal court).  These rights and responsibilities are hardly consistent with the Associations' minimalist characterization of official proponents.

Perhaps most tellingly, unlike a lobbyist's suggestion to a legislator, qualifying an initiative for the ballot is a *necessary* step for the people to exercise the initiative power. *See* Cal. Elec. Code § 9200 (authorizing municipal initiatives "pursuant to" the rules in the Elections Code); *cf. Costa v. Superior Court*, 128 P.3d 675, 685 (Cal. 2006) (discussing procedural challenges to ballot initiatives).  In this critical respect, it is more like introducing legislation.  Thus, by seeking the legal authority of official proponents, the Associations seek the legislative power of setting the initiative process in motion.

D

We turn now to the question of whether serving as an official proponent, as we have described that status, is an aspect of the freedom of speech protected by the First Amendment.

The Associations rely primarily on *Meyer v. Grant*, 486 U.S. 414 (1988). In *Grant*, Colorado forbade initiative proponents from employing paid petition circulators to gather signatures. *Id.* at 417. The Court held that "[t]he circulation of an initiative petition of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change." *Id.* at 421. Thus, it applied exacting scrutiny to the challenged ban. *Id.* at 420, 428.

As the district court astutely observed, *Grant* held that "*advocation* and *circulation*" of a petition is protected by the First Amendment, but no one disputed the legal status of the initiative proponents in *Grant*. Whether the *activities* of an official proponent are protected by the freedom of speech is a distinct question from whether *serving as* an official proponent (that is, having the legal authority attaching to official proponents) has the same protection. Thus, the issue presented by the Associations is unanswered by *Grant*. Indeed, it is one that neither the Supreme Court nor our circuit has decided.

The Supreme Court has, however, addressed an analogous situation to the one presented in this case. In *Nevada Commission on Ethics v. Carrigan*, a state ethics law required public officers to recuse themselves from voting on matters in which they might reasonably be said to have a conflict of

interest. 131 S. Ct. 2343, 2346 (2011). Carrigan challenged the law, asserting that the First Amendment protected his right to vote in the city council. *Id.* at 2347.

The Supreme Court held that "restrictions upon legislators' voting are not restrictions upon legislators' protected speech." *Id.* at 2350. Importantly, the Court cited the legislative nature of voting as the reason for its decision: "The Nevada Supreme Court thought a legislator's vote to be protected speech because voting 'is a core legislative function.' We disagree, for the same reason." *Id.* at 2347 (internal citation omitted). The Court elaborated on this rationale: "[A] legislator's vote is the commitment of his apportioned share of the legislature's power to the passage or defeat of a particular proposal. The legislative power thus committed is not personal to the legislator but belongs to the people; the legislator has no personal right to it." *Id.* at 2350. The Court went further and stated that "the act of voting [in a legislature] symbolizes nothing." *Id.* Even if the legislative act of voting were expressive, the Court reasoned, the challenge would still fail because "[t]his Court has rejected the notion that the First Amendment confers a right to use governmental mechanics to convey a message." *Id.* at 2351.

*Carrigan* establishes that the legal authority attaching to a legislative office is not an aspect of the freedom of speech protected by the First Amendment. The Associations seek the legislative authority that comes with serving as official proponents. Following *Carrigan*, we conclude that serving

as an official proponent is not an aspect of speech within the meaning of the First Amendment.[5]

E

The Associations seem to think that because official proponents have authority to engage in expressive activities, such as the power to write the 500-word statement of reasons, the freedom of speech requires that they be permitted to be official proponents. But from the premise that certain activities are expressive, it does not follow that the *legal authority* to engage in such activities is part of the freedom of speech. This case presents that threshold issue: If serving as an official proponent is not part of the freedom of speech, then the expressive nature of official proponents' activities is irrelevant.

A contrary conclusion would produce absurd results. If the mere fact that an activity is expressive meant that there was a First Amendment right to engage in that activity, irrespective of the context in which the activity occurs, then the First Amendment would protect the right of any voter to participate in the debates of the state legislature. After all, such debates are highly expressive in nature. Yet, no one would maintain that the First Amendment prohibits limiting participation in such debates to members of the state legislature. Similarly, the exercise of an official proponents' authority, if expressive in nature, can be limited to those who qualify as official proponents. The First Amendment does

---

[5] *Carrigan*'s holding was limited to the First Amendment. 131 S. Ct. at 2350–51. We express no view here about whether the Associations' alleged right might be protected under other provisions of the Federal Constitution.

not require that associations be allowed to share in the legislative power simply because the *exercise* of such power might be expressive.

The Supreme Court made this clear in *Carrigan*. In addition to upholding Nevada's recusal law, the Court also upheld the recusal provision's prohibition on advocacy. *Id.* at 2347. Because the recusal law was constitutional with respect to legislative voting on conflicted legislation, then it surely must also be the case, the Court reasoned, that the provision restricting who might advocate on that legislation was equally constitutional as a reasonable time, place, and manner restriction. *Id.* (citing *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)). As the Supreme Court observed, "Legislative sessions would become massive town-hall meetings if those who had a right to speak were not limited to those who had a right to vote." *Id.* So too here, any limit that the elector requirement might place on expression incidentally is a reasonable time, place, and manner restriction resulting from the initial, constitutional limitation on whom the people have designated to serve in this official role.

As the Court emphasized in *Carrigan*, *Doe v. Reed* is consistent with *Carrigan*'s holding, *id.* at 2351, and it is consistent with the analysis here. Whereas *Carrigan* concerned whether the *legal authority* to exercise legislative power is protected by the freedom of speech, *Doe* concerned the extent to which the *exercise* of legislative power is protected.[6] *Doe* did not analyze restrictions on who could

---

[6] The concurrence claims that this manner of reconciling *Carrigan* and *Doe* departs from Supreme Court precedent, implying that its own approach is well-established in the U.S. Reports. *See* Concurrence at

sign initiative petitions; it discussed whether the signing of a petition was expressive.**[7]**    561 U.S. at 194–96.    The Associations in this case seek the *legal authority* to exercise legislative power, which is why the analysis is governed by *Carrigan*.    Kneebone and Breitfelder, by contrast, undoubtedly have such authority, but they seek to exercise it in a certain way.  Their challenge is governed by *Doe*.**[8]**  *See infra* Part IV.

The challenge to the elector requirement asks whether the freedom of speech requires the people to delegate legislative power to associations, and *Carrigan* answers that it does not.**[9]**

---

45–48.    Yet, other than the Supreme Court's brief paragraph distinguishing *Carrigan* from *Doe*, *see Carrigan*, 131 S. Ct. at 2351, no federal court has described how *Carrigan* and *Doe* interact.  Thus, *any* effort in this regard will break new ground, including that of the concurrence.

**[7]** The concurrence is, therefore, quite wrong when it asserts that *Doe* controls the elector requirement analysis.  The key question with regard to the elector requirement is whether California's decision not to delegate legislative authority to associations violates the freedom of speech.  *Doe* has nothing to say about that question.

**[8]** This distinction between the *legal authority* to exercise legislative power and the *exercise* of such power explains why the dissent errs when it treats the challenges to the elector and petition-proponent disclosure requirements identically.  *See* Dissent at 52.  Only if we ignore *Doe*'s clear instruction, as the dissent would do, can we conclude that the legislative character of initiative petitions strips proponents of First Amendment protection.

**[9]** Because we conclude that the elector requirement is constitutional, there is no need to resolve the parties' dispute over whether the requirement is located in the California Elections Code, the City Charter, or some other source.

IV

In their challenge to the petition-proponent disclosure requirement, Kneebone and Breitfelder contend that the compelled disclosure of their identities at the point of contact with signatories violates the freedom of speech.

A

The Supreme Court has never held that there is some "freewheeling right" to anonymity in the Constitution. *Doe*, 561 U.S. at 218 n.4 (Stevens, J., concurring in part and concurring in judgment). Rather, the Court has said that the "decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995). In the compelled disclosure context, the abridgment of the freedom of speech consists not in a violation of some amorphous "right to anonymity"; it consists in the "direct regulation of the content of speech," *id.* at 345, or in the burden such disclosures place on speech by, for example, deterring the speaker from speaking, *Buckley v. Valeo*, 424 U.S. 1, 68 (1976); *see also Citizens United*, 558 U.S. at 480–83 (Thomas, J., concurring in part and dissenting in part). Our own precedent has

---

The parties also dispute which standard of review applies to the elector requirement, but because we conclude that such requirement does not implicate the First Amendment, we do not proceed to resolve that question. *See Ala. State Fed'n of Labor v. McAdory*, 325 U.S. 450, 461 (1945) ("It has long been [the Court's] considered practice not to decide abstract, hypothetical or contingent questions, or to decide any constitutional question in advance of the necessity for its decision. . . ." (internal citations omitted)).

followed this basic framework. *See ACLU v. Heller*, 378 F.3d 979, 987 (9th Cir. 2004) (describing the constitutional injury of compelled disclosure as the "direct regulation of the content of political speech").

We have never held that the content of a ballot initiative petition is part of an official proponent's freedom of speech. The Supreme Court has recognized that the content of political handbills, *McIntyre*, 514 U.S. at 337–47, the speech of initiative petition circulators, *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 197–200 (1999), and the signatures of initiative petition signatories, *Doe*, 561 U.S. at 194–96, are protected speech, and thus the compelled disclosure of the speaker's identity to the public constitutes a burden on such speech or a direct regulation thereof. But initiative petitions are official election documents, *San Francisco Forty-Niners*, 89 Cal. Rptr. 2d at 396, and the Court has not had occasion to consider whether the content of such documents constitutes protected speech.[10]

However, because the parties to this litigation agree that the petition-proponent disclosure requirement is a regulation of political speech,[11] we need not resolve that question. We

---

[10] At least one of our sister circuits has implied that, in some circumstances, regulation of the content of initiative petitions would abridge the freedom of speech. *Biddulph v. Mortham*, 89 F.3d 1491, 1500 (11th Cir. 1996) (per curiam) ("We obviously would be concerned about free speech and freedom-of-association rights were a state to enact initiative regulations that were content based or had a disparate impact on certain political viewpoints.").

[11] Norris limits her briefing to the elector requirement. California acknowledges that "an initiative petition is political speech" and states that

will assume—without deciding—that an official proponent's decision to disclose his identity on the face of an initiative petition constitutes political speech, and under *McIntyre*, the compelled disclosure of such information is "a direct regulation of the content of speech" subject to First Amendment scrutiny. *McIntyre*, 514 U.S. at 345.

## B

Of course, we must determine which standard of review governs our analysis of the petition-proponent disclosure requirement's constitutionality.[12]

The Supreme Court has "a series of precedents considering First Amendment challenges to disclosure requirements in the electoral context. These precedents have reviewed such challenges under what has been termed 'exacting scrutiny.'" *Doe*, 561 U.S. at 196. "That standard

---

"[t]here is no doubt that the challenged statutes, which govern the content of an initiative petition, trigger scrutiny under the First Amendment."

[12] Kneebone and Breitfelder bring both as-applied and facial challenges to the petition-proponent disclosure requirement. The nature of their argument, however, is a facial challenge: They claim that the requirement violates the freedom of speech no matter the identities or circumstances of the official proponents. To be sure, Kneebone and Breitfelder have asserted that they, in particular, have reasons for desiring to remain anonymous when serving as official proponents, but their arguments, if correct, preclude the idea that the requirement has a "plainly legitimate sweep" or that "circumstances exist under which [it] would be valid." *United States v. Stevens*, 559 U.S. 460, 472–73 (2010) (internal quotation marks omitted). Because Kneebone and Breitfelder's "claim and the relief that would follow . . . reach beyond the particular circumstances of these plaintiffs," they must "satisfy our standards for a facial challenge to the extent of that reach." *Doe*, 561 U.S. at 194.

requires a substantial relation between the disclosure requirement and a sufficiently important governmental interest." *Id.* (internal quotation marks omitted). The "'strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights.'" *Id.* (quoting *Davis*, 554 U.S. at 744). Like the case before us, *Doe* considered the constitutionality of a law requiring the disclosure of identifying information—in that case, the identities of petition signatories. 561 U.S. at 190–95. The Court applied exacting scrutiny and upheld the law. *Id.* at 197–202.

Against this clearly articulated standard of review for compelled disclosure cases, Kneebone and Breitfelder argue that strict scrutiny should apply. They point to *American Constitutional Law Foundation* ("*ACLF*") as an example of strict scrutiny employed in a disclosure context. The Supreme Court, however, has subsequently characterized the standard of review in *ACLF* as "exacting scrutiny." *See Doe*, 561 U.S. at 196. Moreover, it was precisely because the Court did *not* apply strict scrutiny that Justice Thomas wrote separately in *ACLF*. *See* 525 U.S. at 214–15 (Thomas, J., concurring in the judgment). Thus, nothing in *ACLF* provides a basis for applying strict scrutiny to the petition-proponent disclosure requirement.

California makes no effort to distinguish *Doe*. Rather, it simply asserts that public forum doctrine should govern our analysis. But the state points to no federal case that has adopted such an approach. California might instead have argued that the petition-proponent disclosure requirement relates to the "mechanics of the electoral process," thus subjecting it to the potentially less-demanding "ordinary litigation test." *See McIntyre*, 514 U.S. at 344–45. But *Doe*

forecloses that option.  The *Doe* Court, faced with the compelled disclosure of signatories' identities, rejected the argument that the legislative character of initiative petitions mandated a lesser form of scrutiny.  561 U.S. at 194–96.  If exacting scrutiny applies to the compelled disclosure of signatories' identities, there is no reason why official proponents' identities should not receive the same protection.

We therefore adhere to the Supreme Court's "series of precedents" regarding compelled disclosure by subjecting the petition-proponent disclosure requirement to exacting scrutiny.  *Id.* at 196; *see also Wash. Initiatives Now (WIN) v. Rippie*, 213 F.3d 1132, 1138–39 (9th Cir. 2000) (applying exacting scrutiny to a law compelling the disclosure of circulators' identities, addresses, and compensation).

C

It remains for us to determine whether the petition-proponent disclosure requirement survives exacting scrutiny.  In addressing this question, it is important to bear in mind that the statutory scheme, as incorporated by the City Charter, requires proponents to disclose their identities at three distinct moments in the initiative process: the filing of a signed notice with the City Clerk, Cal. Elec. Code § 9202(a), the publication of the notice in a newspaper of general circulation, *id.* § 9205, and the inclusion of the notice on each section of the circulated initiative petitions, *id.* §§ 9202(a), 9207.  Kneebone and Breitfelder only challenge the last requirement.

The Supreme Court has described exacting scrutiny as a "strict test."  *Buckley*, 424 U.S. at 66.  Although distinct from strict scrutiny, "exacting scrutiny is more than a rubber

stamp." *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 876 (8th Cir. 2012). Indeed, "[t]he Supreme Court has not hesitated to hold laws unconstitutional under this standard." *Id.* (collecting cases). As *Buckley* made clear, it is not enough for the state to have "some legitimate governmental interest"; the Court "also ha[s] insisted that there be a . . . 'substantial relation' between the governmental interest and the information required to be disclosed." 424 U.S. at 64. Moreover, it is the *government's* burden to "show that its interests . . . are substantial, that those interests are furthered by the disclosure requirement, and that those interests outweigh the First Amendment burden the disclosure requirement imposes on political speech." *WIN*, 213 F.3d at 1138–39; *see also Ctr. for Individual Freedom, Inc. v. Tennant*, 706 F.3d 270, 282 (4th Cir. 2013); *Minn. Citizens Concerned for Life, Inc.*, 692 F.3d at 877. Thus, the mere assertion of a connection between a vague interest and a disclosure requirement is insufficient.

California asserts two interests in the petition-proponent disclosure requirement: (1) informing electors of an official proponent's identity, and (2) "preserving the integrity of the electoral process." Quoting *Doe*, the state claims that the latter interest "extends more generally to promoting transparency and accountability in the electoral process." *Doe*, 561 U.S. at 198. The district court relied on both interests in sustaining the petition-proponent disclosure requirement.

1

California contends that the public has a right to know the identities of official proponents because an initiative is analogous to the introduction of legislation, and therefore "it

is no different from the requirement that every bill in the California Legislature be introduced by a member of the Legislature."  California believes that "[l]egislation is inherently a public act, regardless of the forum in which it takes place."  The district court agreed, relying on two of our cases that stressed the need for voters to know the identities of those participating in initiative campaigns.  *See Human Life of Wash., Inc. v. Brumsickle*, 624 F.3d 990 (9th Cir. 2010); *Cal. Pro-Life Council v. Getman*, 328 F.3d 1088 (9th Cir. 2003).

Even assuming that this interest is sufficiently important to satisfy exacting scrutiny, California must demonstrate that the interest bears a substantial relation to the petition-proponent disclosure requirement.  Kneebone and Breitfelder argue that because proponents must disclose their identities at two distinct moments before circulating a petition, any member of the public who wishes to learn the identities of official proponents can do so, and there is no need for disclosure on the face of the petition.  California also cites the notice-filing and publication requirements, but it argues that these prior disclosures cut the other way: "[B]y the time proponents' names are printed on initiative petitions, their identities are already known—the impact on proponents' privacy is negligible because their names have already been published in a newspaper of general circulation."

The precedents of the Supreme Court and this circuit have emphasized the importance of anonymity at the point of contact with voters.  *McIntyre v. Ohio Elections Commission* established that "an author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment."  514 U.S. at 342.  In the

realm of political speech, anonymity is important because it "provides a way for a writer who may be personally unpopular to ensure that readers will not prejudge her message simply because they do not like its proponent." *Id.* The Court therefore applied exacting scrutiny and struck down an Ohio statute requiring authors of any "form of general publication which is designed . . . to influence the voters in any election" to disclose their identities. *Id.* at 338 n.3, 345–46.

The Court extended *McIntyre*'s holding in *ACLF*. In that case, the Court applied exacting scrutiny to invalidate a Colorado requirement that petition circulators wear badges disclosing their identities at the point of contact with signatories, and it contrasted this invalid rule with the requirement that those same circulators submit affidavits to the state containing their names, addresses, and signatures: "Unlike a name badge worn at the time a circulator is soliciting signatures, the affidavit is separated from the moment the circulator speaks." 525 U.S. at 198. The Court saw this separation in time as important because revealing one's identity at the point of contact with signatories "operates when reaction to the circulator's message is immediate and may be the most intense, emotional, and unreasoned." *Id.* at 199 (internal quotation marks omitted).

The Court observed that, when a circulator makes contact, "the circulator must endeavor to persuade electors to sign the petition," *id.*, a concern expressed in *McIntyre*'s statement that "an advocate may believe her ideas will be more persuasive if her readers are unaware of her identity," 514 U.S. at 342. For that reason, *ACLF* held that "the badge requirement compels personal name identification at the precise moment when the circulator's interest in anonymity

is greatest." 525 U.S. at 199. By contrast, the affidavit requirement was "responsive to the State's concern" for providing the identifying information to the public, but it did so without interfering with the point of contact. *Id.* at 198. Thus, there was not a sufficient governmental interest to justify the badge requirement. *Id.* at 200.

Our decision in *WIN v. Rippie* followed a similar chain of reasoning. WIN challenged a Washington law that compelled the disclosure of petition circulators' identities, addresses, and compensation before and after an election. *WIN*, 213 F.3d at 1134–35. These disclosures were "routinely filed during the circulation period," which we said created a chilling effect on speech. *Id.* at 1138–39. Applying exacting scrutiny, we struck down the disclosure requirement. *Id.* at 1140. Central to our holding was our judgment that the "interest in educating voters through campaign finance disclosure is more adequately served by a panoply of the State's other requirements that have not been challenged." *Id.* at 1139. Like *ACLF*, *WIN* illustrates that, where alternative means of furthering the state's interest are available, it will be very difficult for a compelled disclosure law to survive exacting scrutiny.

*Heller* remains our clearest articulation of the principles underlying *McIntyre*, *ACLF*, and *WIN*. In *Heller*, we invalidated a Nevada law that required "certain groups or entities publishing any material or information relating to an election, candidate or any question on a ballot to reveal *on the publication* the names and addresses of the publications' financial sponsors." 378 F.3d at 981 (internal quotation marks omitted). Our holding rested on "[t]he constitutionally determinative distinction between on-publication identity disclosure requirements and after-the-fact reporting

requirements" that we said "has been noted and relied upon both by the Supreme Court and by this Circuit." *Id.* at 991. We said *ACLF* stands for the following proposition: "[I]t is not just *that* a speaker's identity is revealed, but *how* and *when* that identity is revealed, that matters in a First Amendment analysis of a state's regulation of political speech." *Id.* (emphasis added) (citing *WIN*, 213 F.3d at 1138). For that reason, "requiring a publisher to reveal her identity on her election-related communication is considerably more intrusive than simply requiring her to report to a government agency for later publication how she spent her money." *Id.* at 992. Because the Nevada law required the speaker to disclose her identity on the face of the election-related communication, we held the state's asserted interests were inadequate to justify the burden on speech. *Id.* at 1002.

In all of these precedents, the Supreme Court and this circuit have taken the view that "[t]he injury to speech is heightened" when speakers are compelled to disclose their identities "at the same time they deliver their political message." *ACLF*, 525 U.S. at 199 (internal quotation marks omitted). Such is the case here, where the petition-proponent disclosure requirement forces official proponents to reveal their identities on the face of the petition. Forced disclosures of this kind are "significant encroachments on First Amendment rights." *Buckley*, 424 U.S. at 64.

These precedents also make clear that, where there are alternative methods of meeting the government's asserted interests, the government's task of justifying a compelled disclosure law becomes much more onerous. *See ACLF*, 525 U.S. at 198–99; *WIN*, 213 F.3d at 1139. California contends that voters have an interest in knowing the identities

of official proponents, but such identities are already disclosed on two occasions before petition circulation can begin. Proponents must disclose their identities to the City Clerk when they file the notice of intent, and the Clerk must provide copies of the notice to "any person upon request." Cal. Elec. Code §§ 9202(a), 9202.5[13]. Additionally, there is the publication requirement. *Id.* § 9205(a)–(b). Voters who wish to know the identities of official proponents need only make a trip to the City Clerk's office or search for the publication of the petition in their newspapers of general circulation.

Like *ACLF* and *McIntrye*, the statutory scheme here "compels personal name identification at the precise moment when the [speaker's] interest in anonymity is greatest." *ACLF*, 525 U.S. at 199. Like *Heller*, the disclosure requirement in this case implicates the "constitutionally determinative distinction between on-publication identity disclosure requirements and [before-or-] after-the-fact reporting requirements." 378 F.3d at 991. Like *ACLF* and *WIN*, there are alternative means of disclosure that are "responsive to the [public's] concern" in knowing the identities of those involved in the initiative process. *ACLF*, 525 U.S. at 198. Under these circumstances, the informational interest does not bear a substantial relation to the petition-proponent disclosure requirement and fails exacting scrutiny.

---

[13] Section 9202.5 was enacted by the California legislature in 2012 and took effect on January 1, 2013. *See* Cal. Elec. Code § 9202.5 (West 2013).

2

California also asserts an interest in maintaining the integrity of the electoral process.  *Doe* sustained a Washington disclosure law on the basis of a similar interest, *see* 561 U.S. at 197–98, and we will assume that the same interest is sufficiently important for purposes of this case.

California provides no explanation for how its interest in the integrity of the electoral process relates to the petition-proponent disclosure requirement.  It simply asserts the interest.  The district court elaborated on the nature of this interest: "By requiring a proponent's name to appear on the circulated copy of the ballot initiative, the local voters who consider the initiative may recognize whether the proponent qualifies as an elector."  The district court appeared to be saying that an anti-fraud interest underlay the petition-proponent disclosure requirement, an interest the Supreme Court found sufficiently important in *Doe*.  *Id.*

If the state is concerned about fraudulent proponents, as the district court suspected, it can protect against that possibility using the unchallenged disclosure requirements. *See* Cal. Elec. Code §§ 9202, 9202(a), 9205(a)–(b).  At each of these stages, elections officials or the interested public can verify proponents' qualifications.  In *Doe*, Washington demonstrated that the existence of measures other than the disclosure requirement at issue did not alleviate the possibility of fraud and voter error.  *See, e.g.*, 561 U.S. at 198 (pointing out that "the secretary's verification and canvassing will not catch all invalid signatures").  It is California's burden to show that the alternative methods of satisfying its anti-fraud goal are insufficient.  *WIN*, 213 F.3d at 1138–39.

Not only has it failed to carry its burden; it has not even attempted to do so.

California claims that, as was the case with Washington in *Doe*, its "interest in preserving electoral integrity is not limited to combating fraud." 561 U.S. at 198. Rather, the interest "extends more generally to promoting transparency and accountability in the electoral process." *Id.* California has not shown how the petition-proponent disclosure requirement serves that interest or why the alternative disclosure requirements are inadequate, relying instead on the bare pronouncement of its interest. That is insufficient to satisfy exacting scrutiny. *See WIN*, 213 F.3d at 1138–39; *Ctr. for Individual Freedom, Inc.*, 706 F.3d at 282; *Minn. Citizens Concerned for Life, Inc.*, 692 F.3d at 877.

D

A few responses to the dissent are in order. The dissent acknowledges that Supreme Court and Ninth Circuit precedent is deeply skeptical of compelled disclosure requirements like the one challenged in this case, but it claims that these cases "d[o] not apply here." Dissent at 60. The dissent seems to argue that official proponents, when acting in their official capacity, have *no* right to speak anonymously during the initiative process due to the public nature of their office and the legislative character of an initiative petition.[14]

---

[14] The dissent also implies that, because it relies exclusively on California's asserted interest in the integrity of the electoral process to sustain the petition-proponent disclosure requirement, the doctrine of *McIntyre*, *ACLF*, *Heller*, and *WIN* is inapplicable. Dissent at 60. But *Doe* applied the doctrine of those cases in evaluating the constitutionality of Washington's compelled disclosure law, even though *Doe*, like the dissent, relied exclusively on the interest in the integrity of the electoral

*Id.* Not a single precedent of this Court or of the Supreme Court has ever relied on such distinctions to sustain a compelled disclosure requirement, and the dissent does not cite any.[15]

More fundamentally, it is incoherent for the dissent to deny that official proponents have no right to speak anonymously while simultaneously applying a form of scrutiny designed to safeguard that very right. *See* Dissent at 55–56 (agreeing that exacting scrutiny applies). Compelled disclosure requirements are constitutionally suspect because the "decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment." *McIntyre*, 514 U.S. at 342. But if the dissent denies that the right to remain anonymous is an aspect of official proponents' freedom of speech, then the petition-proponent disclosure requirement is not a "regulation of the content of speech," *id.* at 345, and there is no reason to apply exacting scrutiny. *See Doe*, 561 U.S. at 219–21 (Scalia, J., concurring in the judgment) (stating that the majority applied exacting scrutiny after finding that petition

---

process. 561 U.S. at 195–202. The dissent cannot avoid the clear instructions of *McIntyre*, *ACLF*, *Heller*, and *WIN* merely by invoking the interest in electoral integrity.

[15] To the extent the dissent relies on the fact that an initiative petition is a legislative document, *Doe* forecloses such argument. The signatories in *Doe*, no less than the official proponents in this case, were introducing legislation; their signatures were necessary for the petition to qualify for the ballot. In that case, Washington raised precisely the same argument the dissent makes here: because signatories are engaging in a "legally operative legislative act," they were not entitled to the same level of First Amendment protection as they would be in other contexts. *Doe*, 561 U.S. at 195. The Supreme Court rejected that rationale. *Id.* at 195–96.

signatories have a right to anonymous political expression); *Church of Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 208–09 (2d Cir. 2004) (declining to apply exacting scrutiny "[b]ecause . . . plaintiffs' right to anonymous speech is not implicated here").  In short, the dissent agrees we must apply a level of scrutiny that is only appropriate if official proponents have some right to speak anonymously, yet it denies that they have such a right.  This confusion, we suggest, undermines the dissent's analysis.

The dissent's confusion is compounded by its failure to resolve the fundamental problem with California's argument: Even assuming that California has an important interest in forcing official proponents to disclose their identities, why must that disclosure occur on the face of initiative petitions? Kneebone and Breitfelder do not disagree that official proponents undertake duties and responsibilities that require disclosing proponents' identities to the public.  After all, they do not challenge the notice-filing and publication requirements.  They simply wish to remain anonymous at the point of contact with voters.  The dissent never explains why *a particular form of disclosure*—the petition-proponent disclosure requirement—is substantially related to the state's interest when there are alternative, unchallenged means of disclosure.[16]

---

[16] Significantly, California makes *no effort* to show why the petition-proponent disclosure requirement is needed given that the public can learn official proponents' identities through the notice-filing and publication requirements.  Even if the dissent were able to articulate such a justification, the burden is on *California*—not members of this Court—to do so.  *WIN*, 213 F.3d at 1138–39; *Ctr. for Individual Freedom, Inc.*, 706 F.3d at 282; *Minn. Citizens Concerned for Life, Inc.*, 692 F.3d at 877.

Instead, the dissent merely asserts that the unchallenged disclosure provisions would "fail to satisfy the government's interest in any meaningful or realistic sense." Dissent at 62. The dissent may very well think that, but Supreme Court precedent is to the contrary. Any voter who wants to know the identities of official proponents before signing a petition can find out by visiting the City Clerk's office or looking up the identities in the newspaper of general circulation, Cal. Elec. Code § 9202(a),§ 9202.5, § 9205, a far more accessible means of gaining information than Colorado voters had available to them after *ACLF*. Moreover, in *ACLF*, it was far less convenient for Colorado voters to seek out the affidavits of petition circulators than it was to have the circulators wear identification badges, but the Court nonetheless invalidated the badge requirement. 525 U.S. at 198–200. Perhaps the dissent has an explanation for why Colorado voters should have to work harder than California voters when evaluating initiative petitions, but we cannot fathom what it might be.

The petition-proponent disclosure requirement does not satisfy exacting scrutiny.

E

The petition-proponent disclosure requirement is unconstitutional. Unlike the challenge to the elector requirement, none of the parties assert that the petition-proponent disclosure requirement exists apart from the state elections code. Thus, §§ 9202 and 9207 of the California Elections Code are invalid to the extent that they require official initiative proponents to identify themselves on the face of initiative petitions.

V

We affirm the district court's grant of summary judgment to the defendants as to the elector requirement, but we reverse its grant of summary judgment to the defendants as to the petition-proponent disclosure requirement. We therefore reverse the district court's denial of summary judgment to the plaintiffs as to the petition-proponent disclosure requirement and remand so that it can enter an injunction consistent with this opinion. The parties shall bear their own costs.

**AFFIRMED in part, REVERSED in part, and REMANDED.**

BEA, Circuit Judge, concurring:

I join all of the majority opinion except for Section III, which analyzes the local and state requirements that official ballot initiative proponents be electors, thereby excluding associations. Although I concur in the result of Section III, I see the issue differently. I believe that the majority opinion employs an incorrect test to determine whether acting as an official ballot initiative proponent is a legislative act with expressive content or an expressive act with legislative effect, and thus whether the elector requirement burdens any First Amendment rights. The test should not be whether a particular act has legislative effect or legislative character. The correct test, as stated in *Doe* and *Carrigan*, asks whether the individual—here the ballot initiative proponent—is exercising his own power, as does a ballot initiative signatory (*Doe*), or is exercising a governmental power that has been democratically apportioned to him, as does a legislator voting

in a legislature (*Carrigan*). When I apply this test I conclude that acting as a ballot initiative proponent is an expressive act, despite its legislative effect, and is protected by the First Amendment. Therefore, the elector requirement implicates the First Amendment and must be so analyzed. Nonetheless, I conclude the elector requirement satisfies at least the exacting scrutiny test applied to state electoral regulations under the First Amendment, and therefore I concur with the opinion's conclusion upholding the elector requirement.

I

A

The majority opinion incorrectly identifies what is the precise right sought to be vindicated by the appellants. In its Section III.B, the majority opinion suggests that the appellants seek "the legal authority attaching to the status of an official proponent." Maj. Op. at 14. No, the precise right the appellants want is not merely an abstract "authority." Put more simply and precisely, the appellants wish "to be initiative proponents." Blue Br. at 6. Becoming an official ballot initiative proponent produces a particular quality of speech. When someone is qualified as an official proponent, he is able to speak from a particular vantage as an author of the proposal. The quality and impact of speech by official ballot initiative proponents is different from that of a mere member of the public. "Proponents" can be seen as sufficiently civic-minded to have taken the time and borne the cost to bring up a measure. They have also taken the risk of being identified with a particular political view. Because of their demonstrated interest and willingness to risk opprobrium, moreover, their speech is likely to carry greater weight once their position as ballot proponents is recognized.

By restricting who may serve in this role, Chula Vista and California restrict the range of speech non-electors and associations can exercise.

The majority opinion also errs in holding that being an official ballot initiative proponent is a legislative act. The majority opinion holds that being an official ballot initiative proponent is legislative at core because California state cases and laws describe the ballot initiative proponent as akin to a legislator, and because the acts of a ballot initiative proponent are legislative in character and effect.

With respect, this test is mistaken. The Supreme Court has explicitly held that expressive acts can still be protected by the First Amendment, even if they have a legislative effect under the state's laws. *Doe v. Reed*, 561 U.S. 186, 194–96 (2010).[1] Indeed, if having legislative effect could deprive an expressive act of First Amendment protection, then

---

[1] It should be noted that the respondent in *Doe v. Reed* made the same argument that the majority opinion does here, namely that acting as a ballot initiative signatory was a legislative act not protected by the First Amendment because the Supreme Court of Washington had declared it to be so. As the respondent's brief before the Supreme Court in *Doe* stated, "The Washington Supreme Court has stated that the 'exercise of the initiative power is an exercise of the reserved power of the people to legislate' and that '[in] approving an initiative measure, the people exercise the same power of sovereignty as the legislature does when enacting a statute.' *Amalgamated Transit Union Local 587 v. State*, 11 P.3d 762, 779 (Wash. 2000)." Brief of Respondent at 24, *Doe v. Reed*, 561 U.S. 186 (2010) (No. 09–559), 2010 WL 1250504. The Supreme Court in *Doe*, however, did not even address this argument, and thus did not find it dispositive; nor should this panel. If acting as a ballot initiative signatory is still a First Amendment activity despite its characterization as a "legislative act" by state law, then this same logic should apply to acting as a ballot initiative proponent.

governments could limit political speech by granting legislative effect to particular speech acts. The majority opinion ignores the test the Supreme Court itself has already laid out in *Doe* and *Carrigan* to determine whether a particular political activity is speech protected by the First Amendment or is a legislative act with no First Amendment protection.

The *Doe* Court stated the general rule that "[a]n individual express[ing] a view on a political matter" when participating in a political activity, whether or not it also happens to have a governmental effect. *Id.* at 194–95. The Court held that "sign[ing] a petition under Washington's referendum procedure" was an example of an individual expressing a view on a political matter. *Id.* If the activity expresses a political view, then generally it "implicates a First Amendment right." *Id.* at 195. Moreover, the First Amendment still protects that expressive activity even if it has "legal effect in the electoral process":

> [S]igning a referendum petition may ultimately have the legal consequence of requiring the secretary of state to place the referendum on the ballot. But we do not see how adding such legal effect to an expressive activity somehow deprives that activity of its expressive component, taking it outside the scope of the First Amendment.

*Id.*

*Carrigan* created an exception to this general rule. When an individual performs a legislative act through his office as

legislator—such as a legislator voting in a legislature—that act is not protected by the First Amendment because:

> a legislator's vote is the commitment of his apportioned share of the legislature's power to the passage or defeat of a particular proposal. The legislative power thus committed is not personal to the legislator but belongs to the people; the legislator has no personal right to it.

*Nevada Comm'n on Ethics v. Carrigan*, 131 S. Ct. 2343, 2345 (2011). In other words, a legislative act is one that an individual performs not as an individual or as a "principal," but as an elected representative, or an "agent" of the people, *i.e.* "a governmental act [an individual performs] as a representative of his constituents." *Id.* at 2351 n.5.

*Carrigan* stated that it was not in tension with *Doe*. *Id.* at 2351. The *Carrigan* Court described *Doe* as holding that "core political speech," such as signing a ballot initiative petition, "was not deprived of its protected status simply because, under state law, a petition that garnered a sufficient number of signatures would suspend the state law to which it pertained, pending a referendum." *Id.* Such political speech, the *Carrigan* Court held, was distinguishable from the legislative, governmental act of a legislator voting in a legislature: "It is one thing to say that an inherently expressive act remains so despite its having governmental effect, but it is altogether another thing to say that a governmental act becomes expressive simply because the governmental actor wishes it to be so." *Id.*

Likewise, even if an act is a legally effective part of the political process, it still may be an expressive act protected by the First Amendment. "[T]he State, having chosen to tap the energy and the legitimizing power of the democratic process, must accord the participants in that process the First Amendment rights that attach to their roles." *Doe*, 561 U.S. at 195 (internal quotation marks, ellipsis, and brackets omitted). Only if the act done is authorized by a governmental, democratically apportioned representative power does it cease to be a personal act and thereby cease to be protected by the First Amendment.

Thus, when a court must decide whether a political act is inherently expressive and therefore protected by the First Amendment or is a legislative, governmental act and therefore not at all protected by the First Amendment, the court must determine whether the act is more similar to the act in *Doe* (signing a ballot initiative) or the act in *Carrigan* (a legislator voting in a legislature). The relevant question is whether the politically expressive act is personal to the actor, or is merely exercised by him through democratic delegation of governmental power to him and therefore does not belong to him.

Applied here, this test reveals that the act of being a ballot initiative proponent, just like the signing of a ballot initiative proposal in *Doe*, is at its core expressive, not legislative, despite its legislative effect. An official ballot initiative proponent is neither an elected nor democratically appointed position. The proponent has volunteered to exercise his own power vested in him by California state law, Cal. Elec. Code § 9202(a). He does not exercise a power that has been democratically apportioned to him as an "agent" of a governmental body. Therefore, the Chula Vista and

California elector requirements burden the First Amendment rights of those who desire to become official ballot initiative proponents.   In other words, being a ballot initiative proponent is more like being a ballot initiative signatory (*Doe*) than it is like a legislator voting in a legislature (*Carrigan*).

It may be argued that the electors of California, or those of Chula Vista, have "apportioned" to themselves the right to act as ballot initiative proponents, and thus that becoming the proponent of an initiative is the legislative act of an agent of the people.  This argument would fail, however, because it is equally applicable to the ballot initiative signatories in *Doe*. The electors of Washington state "apportioned" to themselves the right to act as ballot initiative signatories just as the electors of California "apportioned" to themselves the right to act as ballot initiative proponents.  The Supreme Court holding in *Doe*, however, shows that this level of "apportionment" does not convert the act from a personal, expressive one to a delegated, representative one.  Therefore, when analyzed under the correct *Doe-Carrigan* framework, acting as an official ballot initiative proponent is a personal act of political expression that happens to have legislative effect, similar to acting as a ballot initiative signatory; it is not the governmental act of a democratically appointed agent of the people.  The First Amendment therefore applies to any governmental restraints on such political expression.

B

Instead of applying the *Doe-Carrigan* framework to determine whether the activity at issue is protected by the First Amendment, the majority opinion applies its own test. It distinguishes between "the *activities* of an official

proponent" and "*serving* as an official proponent (that is, having the legal authority attaching to official proponents)." Maj. Op. at 18. As the majority opinion puts it, just because "certain activities are expressive, it does not follow that the *legal authority* to engage in such activities is part of the freedom of speech. This case presents that threshold issue."[2] Maj. Op. at 20. Therefore, the majority opinion concludes, this case is controlled by *Carrigan*, and not by *Doe*: "*Carrigan* concerned whether the *legal authority* to exercise legislative power is protected by the freedom of speech,

---

[2] The majority opinion suggests that "[a] contrary conclusion would produce absurd results." As the majority opinion explains:

> If the mere fact that an activity is expressive meant that there was a First Amendment right to engage in that activity, irrespective of the context in which the activity occurs, then the First Amendment would protect the right of any voter to participate in the debates of the state legislature. After all, such debates are highly expressive in nature. Yet, no one would maintain that the First Amendment prohibits limiting participation in such debates to members of the state legislature.

Maj. Op. at 20. This hypothetical reveals the error in the majority opinion's reasoning. No one would argue that the calculus for determining whether the First Amendment protects a particular speech act is whether that act is expressive; this argument slays a mere straw man. Nor is legislative effect dispositive. As discussed above, the act in *Carrigan* was expressive in nature (and unprotected by the First Amendment) and the act in *Doe* was legislative in effect (and protected by the First Amendment). Neither fact was determinative. Instead, the correct test is whether the speech act is one that belongs to the individual and thus is constitutionally protected or one that stems from a governmental authority that has been democratically apportioned and thus can be limited by the entity which granted the authority. Acting as a legislator is a legislative activity. Acting as a ballot initiative signatory is a First Amendment activity.

[while] *Doe* concerned the extent to which the *exercise* of legislative power is protected." Maj. Op. at 21.

In other words, according to the majority opinion, if a given act is considered a speech act at core, as opposed to a legislative act, and thus is protected by the First Amendment, then governmental limits on *how* that speech is to be exercised would be analyzed under constitutional standards, but the First Amendment would provide no protection against governmental limits on *who* can exercise that speech. I see no constitutional basis for the distinction between possessing a right and exercising that right. Moreover, the majority opinion's approach could allow governments to control the content of political speech by restricting the access to particular forms of political speech , and to avoid having those restrictions analyzed under the First Amendment.

Indeed, *Citizens United* refutes the majority opinion's "threshold question" argument. The majority opinion here states that, because the state did not grant associations the right to be official ballot initiative proponents, the panel need not analyze the law under the First Amendment. *Citizens United*, on the other hand, examined the constitutionality of a statute and found it unconstitutional precisely *because* associations were excluded from participating in a particular activity. *Citizen United v. FEC*, 558 U.S. 310 (2010). In *Citizens United*, 2 U.S.C. § 441b prevented associations from making expenditures in connection to an election to public office. The Supreme Court examined the "threshold question" that the majority opinion here discusses and held that "[p]remised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints. Prohibited, too, are restrictions distinguishing among different speakers, allowing speech by

some but not others." *Id.* (internal quotation marks and citations omitted). "We find no basis," the Court went on, "for the proposition that, in the context of political speech, the Government may impose restrictions on certain disfavored speakers." *Id.* at 341. Thus, even the "threshold question" of *who* gets to participate in a particular speech act must be analyzed under the First Amendment.

Finally, under *Citizens United*, associations have the right to assert these First Amendment protections. *Id.* at 365 ("[T]he Government may not suppress political speech on the basis of the speaker's corporate identity.").

## II

Because the majority opinion concludes that the elector requirement does not burden the First Amendment at all, it does not address what scrutiny should be applied to determine its constitutionality. Because I conclude that the elector requirement does burden the First Amendment, however, I now address the proper scrutiny to be applied.

Under *Citizens United*, it would seem at first blush that, because the "elector requirement" burdens political speech on the basis of the identity of the speaker, it should be analyzed under strict scrutiny. *See Citizens United*, 558 U.S. at 340 ("Laws that burden political speech are subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." (internal quotation marks omitted)).

The language of the Supreme Court in *Doe*, however, suggests an indeterminate but deferential level of scrutiny for

restrictions in the ballot initiative process such as the elector requirement. The six-person majority in *Doe* stated:

> [T]he electoral context is [not] irrelevant to the nature of our First Amendment review. We allow States significant flexibility in implementing their own voting systems. . . . The State's interest in preserving the integrity of the electoral process is undoubtedly important. States allowing ballot initiatives have considerable leeway to protect the integrity and reliability of the initiative process, as they have with respect to election processes generally.

*Doe*, 561 U.S. at 197 (internal quotation marks omitted); *see id.* at 212–13 (Sotomayor, J., concurring) ("States enjoy considerable leeway to . . . specify the requirements for obtaining ballot access . . . . As the Court properly recognizes, each of these structural decisions inevitably affects—at least to some degree—the individual's right to speak about political issues and to associate with others for political ends. For instance, *requiring petition signers to be registered voters* . . . no doubt limits the ability or willingness of some individuals to undertake the expressive act of signing a petition. Regulations of this nature, however, stand a step removed from the communicative aspect of petitioning, and the ability of States to impose them can scarcely be doubted.") (citations and internal quotation marks omitted) (emphasis added). *Doe* therefore suggests that regulations of the electoral process, such as the "elector" requirement, while burdening the First Amendment, are subject to a deferential level of scrutiny, less demanding than strict scrutiny. We must therefore conclude, on the basis of the deferential

language in *Doe*, that not all political expression has the same protection, and that burdens that state and local governments impose on political expression while those governments are "implementing their own voting systems," *Doe*, 561 U.S. at 2819, must be analyzed under a level of scrutiny more deferential than strict scrutiny.

Considering the deferential language of *Doe*, and because the elector requirement burdens "core political speech," *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995), the level of scrutiny used here should be exacting scrutiny, which requires a "substantial relation" between the elector requirement and a "sufficiently important" governmental interest. *Doe*, 561 U.S. at 195.

The interest that California asserts as the basis for the "elector requirement" here is "that only the people themselves shall exercise the right of self-government reserved in the initiative." California and Chula Vista assert an interest that only those with "skin in the game," *i.e.* electors, who will be affected by the measure, should initiate the referendum process. The California state and local governments want only civic-minded locals, who presumably would have knowledge of local affairs and would themselves be affected by the referendum, to participate in the initiative process. Otherwise, carpetbaggers, who themselves would not bear the full cost of initiating a proposal and who would not be burdened by the effects of the referendum, could hijack the initiative process and dictate a state's referendum agenda. Considering the language of *Doe*, such an interest is "sufficiently important," and thus satisfies that prong of the exacting scrutiny test.

The second part of the exacting scrutiny test requires that the elector requirement be "substantially related" to the governmental interest. The elector requirement could be more narrowly tailored to achieve its objective. In particular, the elector requirement is overinclusive, in that it prevents from being an official ballot initiative proponent an association made up entirely of electors, even though such an association would not detract from the governmental interest of insuring that only those with "skin in the game" initiate the referendum process. The elector requirement, therefore, because it is overinclusive, does not comply with the narrow tailoring requirement of strict scrutiny. *See Citizens United*, 558 U.S. at 340. Under *Doe*'s more deferential level of exacting scrutiny applied here, however, the elector requirement is substantially related to the governmental interest.[3] It ensures that only those with "skin in the game" will initiate the referendum process. Moreover, although it prevents electors from initiating ballot proposals in association with each other, it does not prevent them from doing so as individuals. Therefore, I conclude that the elector requirement satisfies exacting scrutiny; thus, I would reach the same outcome as the majority opinion.

III

Like the majority opinion, I think that the elector requirement does not violate the Constitution. I, however, would follow closely the test articulated in *Doe* and *Carrigan.* This would ensure that core political expression is analyzed under the correct constitutional framework and would prevent

---

[3] *Doe* was decided June 24, 2010, five months after *Citizens United* was handed down.

core political expression from being denied the protection of the First Amendment.

GRABER, Circuit Judge, concurring in part and dissenting in part:

Two groups of Plaintiffs[1] mount challenges to two restrictions that the people of California have placed on their initiative process: (1) the requirement that official proponents be electors, that is, individual voters; and (2) the requirement that each petition section list the name of at least one official proponent. I agree with the majority opinion that the case is properly before us, and I concur in Part III, which holds that the elector requirement passes constitutional muster. I write separately to dissent from Part IV. The majority opinion properly recognizes in Part III that the role of an official proponent of an initiative petition in California is like that of a legislator. But the majority fails to apply this analogy equally to Part IV. Following the analogy of official proponent as legislator to its logical end, the disclosure requirement survives any level of review.

The overarching question begins and ends with the role of the official proponent within the California lawmaking process. Although the California Constitution does not describe the full contours of the official proponent's role, the California legislature has fleshed it out in a series of statutes.

---

[1] Plaintiffs comprising the Associations are Chula Vista Citizens for Jobs and Fair Competition and the Associated Builders and Contractors, Inc. ("Associations"). Plaintiffs comprising the Individual Plaintiffs are Lori Kneebone and Larry Breitfelder ("Individual Plaintiffs").

Under the California Elections Code, an official proponent enjoys a special relationship to the initiative that continues long after the advocacy process is complete. *See, e.g.*, Cal. Elec. Code §§ 9202, 9205, 9207. In particular, official proponents: (1) bear the obligation "to manage and supervise the process by which signatures for the initiative petition are obtained"; (2) "control the arguments in favor of an initiative measure," including by serving as gatekeeper for all ballot arguments, providing arguments afforded priority status on the ballot, controlling all rebuttal ballot arguments, and retaining the ability to withdraw ballot arguments at any time; and (3) are allowed to intervene, both before and after the initiative is passed, in litigation affecting the initiated statute, and to appeal state court rulings adverse to the initiative's validity. *Perry v. Brown*, 265 P.3d 1002, 1017–18 (Cal. 2011). *But see Hollingsworth v. Perry*, 133 S. Ct. 2652, 2662 (2013) (holding that the authority of the official proponent to intervene in court proceedings pertaining to an initiative is insufficient, without more, to create Article III standing). In addition to having special duties beyond those of ordinary supporters of an initiative, "the official proponents of an initiative measure are recognized as having a distinct role—involving both authority and responsibilities that differ from other supporters of the measure," *Perry*, 265 P.3d at 1017–18, and the California Supreme Court has equated the role of a proponent to that of an elected legislator to whom the people have delegated lawmaking power.[2] It is

---

[2] In fact, California law gives an official proponent more authority than a legislator who, despite having sponsored and championed a piece of legislation through the California legislature, would not have a right to intervene in court on behalf of the legislation after it had been codified. *See Perry*, 265 P.3d at 1021 (noting that legislators would not be afforded the ability to intervene on behalf of a law that they had sponsored, before holding that official proponents could so intervene). The United States

the distinct character of this role that informs the First Amendment analysis for both challenges.

The Individual Plaintiffs challenge a requirement of the California Elections Code that the text of the petitions disclose the name of at least one official proponent. The California Elections Code, as incorporated by the Chula Vista City Charter, requires an official proponent of a ballot initiative to provide a name and signature at three distinct points during the initiative process. First, at least one of the official proponents must provide a name and signature to the City Clerk on the Notice of Intent to Circulate Petition when the document is first filed. Cal. Elec. Code § 9202. Second, the Notice of Intent to Circulate Petition, containing the signature and name of at least one official proponent, must be published in a newspaper of general circulation within the city and county. Cal. Elec. Code §§ 9202, 9205. Finally, the California Elections Code mandates that each section of the petition bear a copy of the Notice of Intent to Circulate Petition, which would necessarily include the name and signature of any official proponent who signed the form initially. *Id.* § 9207.

The Individual Plaintiffs mount a facial challenge to only the final requirement, that each section of the petition bear a copy of the Notice of Intent to Circulate Petition. They contend that this content-based restriction, affecting the text

Supreme Court has held that an official proponent under California law is not equivalent to an elected, public official for Article III purposes under the Federal Constitution. *Hollingsworth*, 133 S. Ct. at 2662. The California Supreme Court, however, retains supreme authority to define the role of an official proponent under state law. *See, e.g.*, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481–82 (1986); *R.R. Comm'n of Cal. v. L.A. Ry. Corp.*, 280 U.S. 145, 152 (1929).

of the petition, impermissibly chills core political speech by forcing speakers to disclose their identities at the point of contact with potential signatories. Because this disclosure is required at the point of contact with voters, the Individual Plaintiffs urge us to review the disclosure regime with strict scrutiny.

Anonymous political advocacy, such as the debate between "Publius" in the Federalist Papers and his detractors "Federal Farmer" and "Cato," has played a fundamental role in the development of our constitutional framework. "Anonymity is a shield from the tyranny of the majority. It thus exemplifies the purpose behind the Bill of Rights, and of the First Amendment in particular: to protect unpopular individuals from retaliation—and their ideas from suppression—at the hand of an intolerant society." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 356 (1995) (citation omitted). It is perhaps because of this essential value that our free speech tradition has hesitated to allow a government to exclude speech from the marketplace of ideas merely because that speech does not disclose its source. *See id.* at 342–43. But compelled disclosure is not a direct prohibition on speech. *Doe v. Reed*, 130 S. Ct. 2811, 2818 (2010); *see also Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 366 (2010) (holding that "disclosure requirements may burden the ability to speak, but they . . . do not prevent anyone from speaking" (citation and internal quotation marks omitted)). Striking a balance between those two points, the Supreme Court has applied "'exacting scrutiny'" to disclosure regimes in the electoral context, which "requires a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest." *Citizens United*, 558 U.S. at 366–67 (quoting *Buckley v. Valeo*, 424 U.S. 1, 64, 66 (1976) (per curiam)). Following *Doe* and

*Citizens United*, I would apply exacting scrutiny to the disclosure regime.

The government maintains that the disclosure requirement is a reasonable regulation of the initiative process that serves two sufficiently important state interests: (1) to preserve the integrity of the initiative process; and (2) to inform signatories "as to who is formally proposing the legislation."[3] Because I find the state's interest in preserving the integrity of the electoral process sufficiently important, indeed compelling, and substantially related to a narrowly tailored disclosure regime, I would find the regime constitutional under any level of scrutiny.

The Supreme Court has consistently recognized that the government's interest in preserving the integrity of the electoral process is sufficiently important to survive exacting scrutiny. *Doe*, 130 S. Ct. at 2819. "States allowing ballot initiatives have considerable leeway to protect the integrity and reliability of the initiative process, as they have with respect to election processes generally." *Id.* (internal quotation marks omitted). The government's interest in preserving the integrity of elections is especially strong in the context of fraud, but the interest "is not limited to combating fraud" and "also extends more generally to promoting transparency and accountability in the electoral process, which the State argues is 'essential to the proper functioning of a democracy.'" *Id.*

---

[3] I do not reach the question whether the people's informational interest is sufficiently important, because I would hold that the government's interest in preserving the integrity of the electoral process alone is sufficiently important to sustain the minimal burden on official proponents.

In the federal context, "[t]he public nature of federal lawmaking is constitutionally required." *Id.* at 2834 (Scalia, J., dissenting) (quoting U.S. Const art. I, § 5, cl. 3: "'Each House shall keep a Journal of its Proceedings, and from time to time publish the same, excepting such Parts as may in their Judgment require Secrecy[.]'"). The lawmaking process is kept transparent for good reason: Knowing the identities of lawmakers and their actions plays an important role in allowing the public to evaluate officials and hold them accountable. "In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation." *Buckley*, 424 U.S. at 14–15.

Similarly, the local government has an "essential" interest in preserving an electoral process in which members of the California public who are considering whether to sign an initiative petition know for whom they are expressing support as the official proponent when they sign a petition—and to whom they will delegate certain lawmaking duties if the petition is successful. The government's interest in supporting the integrity of the electoral process by providing the public with the identity of an official proponent is not directed solely at preventing fraud. The electoral process would be degraded if potential signers have no way of knowing whether their signatures are delegating lawmaking duties to a desirable proponent for the initiative, who will present arguments on behalf of the initiative and defend the initiative in a manner with which the signers agree. As noted, in California official proponents play a central role, both during the lawmaking process and after their initiative is enacted. *Perry*, 265 P.3d at 1017–18. An ineffective official proponent: (1) could fail to manage and supervise the

initiative process; (2) could fail to file the petition with the state; (3) could make poor choices regarding arguments and statements for the ballot; (4) would receive priority status for even the weakest arguments on the ballot; (5) could fail to mount, or could withdraw from the ballot, the better arguments; and (6) could fail to defend the initiative in court proceedings. *Id.*

On issues of public importance, potential signers could face multiple initiatives on the same topic. In order to make an informed decision about which of the initiatives to support, potential signers would need to know the differences in content among the various initiatives. But the voters would also need to know the identities of the official proponents for each initiative so that the voters could evaluate how those official proponents would present the important public issue at hand. Because the official proponent serves an important role in the lawmaking process and is delegated duties in the lawmaking process far beyond that of an advocate, the government has an essential interest in preserving an electoral process that allows voters to know to whom they are delegating lawmaking power when signing a particular petition.

This "essential" interest clearly outweighs the minor actual burden, if any, on the official proponents who must disclose their identities. The role that these individuals wish to fill is itself a *public legislative role* that is akin to the role of an elected legislator. The voluntary undertaking of a California proponent's role entails other duties (beyond the initial filing) that require disclosure of the official proponent's identity, for example, monitoring the integrity of the petition-circulation process, crafting arguments for the ballot, and intervening in court proceedings. Other circuits

have recognized that candidates for public office *have no First Amendment interest in anonymity* by virtue of their voluntary undertaking of a public role. *See, e.g.*, *Majors v. Abell*, 317 F.3d 719, 722 (7th Cir. 2003) ("[The plaintiff's] standing might be questioned on the ground that a candidate has no [free speech] interest in anonymity that the statute might protect; for there are no anonymous candidates."). Similarly, the role sought by these individuals is one that necessarily requires public disclosure of identity. Even assuming that an official proponent has a First Amendment anonymity interest, the potential burden is negligible.

In a different context, the Supreme Court has expressed skepticism that an informational interest can sustain regimes that compel disclosure of the identity of an advocate at the point of contact with voters, or signatories in the initiative context. In *Buckley v. American Constitutional Law Foundation, Inc. ("ACLF")*, 525 U.S. 182, 200 (1999), the Court struck down a Colorado statute requiring every petition circulator to wear a badge bearing the circulator's name, because the public's informational interest in identifying the advocate was insufficiently important to justify chilling political speech and potentially to subject circulators to harassment at the apex of face-to-face political advocacy. Similarly, in *McIntyre*, the Supreme Court struck down an Ohio ban on handbills that failed to identify the name of the advocate, because the public's informational interest in knowing the identity of the advocate "means nothing more than the provision of additional information that may either buttress or undermine the argument in a document." 514 U.S. at 348. Beyond expressing concerns over fear of harassment that could chill political speech, the Court noted that disclosure of the advocates' identity at the point of contact with voters could weaken the effectiveness of the speech:

"[A]n advocate may believe her ideas will be more persuasive if her readers are unaware of her identity." *Id.* at 342; *see also ACLU of Nev. v. Heller*, 378 F.3d 979, 994 (9th Cir. 2004) ("[F]ar from enhancing the reader's evaluation of a message, identifying the publisher can interfere with that evaluation by requiring the introduction of potentially extraneous information at the very time the reader encounters the substance of the message.").

We have adopted the Court's skepticism of an informational interest in the identity of the advocate at the point of contact with voters. *See Heller*, 378 F.3d at 995 (holding that an informational interest in allowing the public to evaluate the advocacy document is not sufficiently important to sustain compelled disclosure of an advocate's identity on the document itself); *(WIN) Wash. Initiatives Now v. Rippie*, 213 F.3d 1132, 1140 (9th Cir. 2000) (holding that an informational interest is not sufficiently important to sustain compelled disclosure of advocates' identities during the circulation period).

But this doctrine does not apply here for two reasons. First, the statute is directed toward the government's interest in preserving the integrity of elections, an interest that the Supreme Court has recognized as sufficient to support mandated disclosure of identity. *Doe*, 130 S. Ct. at 2820. Second, the proponent of a California initiative is asking voters to allow her to *serve an official public role* and to allow her to act on the voters' behalf in the legislative process, not just recounting an idea as an advocate, and a petition is an official legislative form, not a pamphlet or advocacy document. *See Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 363 (1997) (holding that the First Amendment does not provide "a right to use the ballot itself

to send a particularized message"). Here, the disclosure regime seeks to disclose the identity not of an *advocate*, but of an individual who serves as an *official proponent* and representative of the signers in the lawmaking process—a role akin to a candidate for office and recognized explicitly as distinct from that of an advocate under California law. *See Perry*, 265 P.3d at 1017–18 (holding that "the official proponents of an initiative measure are recognized as having a distinct role—involving both authority and responsibilities that differ from other supporters of the measure"). The government's interest in alerting potential signatories to the official proponent's identity, as a representative of the initiative, is markedly different than the interests at stake in *McIntyre*, *Citizens United*, and *ACLF*—that is, knowing the identity of a mere advocate in order to evaluate an argument.

The Individual Plaintiffs respond that the state's interest is satisfied, or lessened, by two other required points of disclosure—at the points of application and publication in a newspaper of general circulation. Cal. Elec. Code §§ 9202, 9205. That argument fails to recognize that the signing of a petition in this context is not simply agreeing to the content of an initiative; it also is an expression of support for *that particular official proponent*. If the name of the official proponent is not printed on the petition, every elector who is considering whether to sign would be required to match the petition with public records or newspaper publications in order to glean whom the elector is designating as the official proponent. The two earlier points of disclosure identified by the Individual Plaintiffs would provide no identifying information whatsoever to an elector who is approached on the street with a petition; the elector would lack sufficient information to allow for an informed decision whether to

sign. Such a disclosure scheme clearly would fail to satisfy the government's interest in any meaningful or realistic sense.

By analogy, if ballots listed only the platforms of candidates for an office, but not the candidates' names, undoubtedly we would not find it sufficient that voters were able to access the names and platforms of candidates from public records or from local media in order to guide voting choices. We do not permit federal candidates for public office to remain anonymous at the point of contact with voters, nor do we force voters to support federal candidates without knowing the candidates' identities. So too here, we should uphold the decision by the citizens of Chula Vista to prohibit anonymous candidates for an official legislative role.

Finally, the Supreme Court has allowed those resisting disclosure to mount a successful First Amendment challenge where "they can show a reasonable probability that the compelled disclosure of personal information will subject them to threats, harassment, or reprisals from either Government officials or private parties." *Doe*, 130 S. Ct. at 2820 (internal quotation marks and brackets omitted). The Individual Plaintiffs, however, have provided no evidence that shows a likelihood of harassment, and they have effectively conceded that they experienced no harassment in response to their service as official proponents to Chula Vista Measure G. Moreover, given the public role that an official proponent serves in the lawmaking process, some public pressure must be expected in order to hold that official proponent accountable to a good faith performance of his duties. Accordingly, Plaintiffs have failed to show that the compelled disclosure would subject them to threats, harassment, or unreasonable reprisals from government officials or the public.

In sum, I would hold that the disclosure regime survives exacting scrutiny because it is substantially related and narrowly tailored to the government's interest in preserving the integrity and transparency of the electoral process by providing voters with the identity of the official proponent. Accordingly, I respectfully dissent from Part IV.  I would affirm the judgment in full.